OPINION OF THE COURT
Philip C. Segal, J.
At issue in this child protective proceeding (Family Ct Act art 10) is whether New York City has the authority to remove a child from his mother, an undocumented alien, but then deny social services ordered by the Family Court to rehabilitate and reunite the family because she is an undocumented alien. Simply stated, the issue is whether the City may use Family Court Act article 10 both as a sword, in removing a child from his home, and a shield, in allowing the City to refuse to provide services needed for family unification. The issue is raised in the context of the present motion filed by the City to be relieved from the court’s order to provide specific social services to respondent mother. For the following reasons, the motion is denied.
I
This proceeding was initiated on August 13, 1999, when the New York City Administration for Children’s Services (ACS) filed a neglect petition against respondent, Millie Kittridge, an undocumented alien from the Republic of Trinidad and Tobago, who suffers from sickle cell anemia. ACS initially charged Ms. Kittridge with, among other things, failing to make suitable arrangements for the care of her 10-year-old son, Sean, during repeated hospitalizations for her illness; ultimately, the petition was amended to allege neglect based on substance abuse. At the fact-finding and dispositional hearings on August 8, 2000, the court found that Sean was at risk as a result of Ms. Kittridge’s addiction to pain killers and directed that ACS: (i) place Sean in foster care until he could be released to Ms. Kittridge; (ii) make reasonable efforts to assist in reuniting the family (see, Family Ct Act § 1055 [c]); and (iii) produce Sean for weekly visits with Ms. Kittridge. The court also specifically ordered that the New York City Department of Social Services (DSS) provide Ms. Kittridge, who is indigent, with (emergency) public assistance, (emergency) Medicaid (to enable her to obtain treatment for her sickle cell anemia — the condition that led to her involvement with ACS in the first place), and necessary (emergency shelter) housing. This direction was made pursuant to Family Court Act § 1055 (c), which authorizes the *878 court to order a “social services official” to provide or assist the parent of a child in foster care in obtaining services to facilitate the rehabilitation of the family and the discharge of the child from foster care. Such services expressly include “assisting the parent * * * in obtaining adequate housing * * * [and] medical care.” (Family Ct Act § 1055 [c]; see also, Family Ct Act § 1015-a.)
As stated, DSS now moves to vacate that portion of the August 8, 2000 order directing the provision of services to Ms. Kittridge because (i) as an “illegal * * * alien” she is “ineligible,” (ii) notwithstanding a duly authorized court order pursuant to Family Court Act § 1055 (c) to provide the services, Ms. Kittridge must follow the usual practice of first applying administratively to DSS and being found eligible, and (iii) DSS cannot provide or even refer Ms. Kittridge to emergency housing because DSS “is not [the New York City] Housing Authority.”
II
New York State has made a clear, concrete and absolute constitutional commitment to provide assistance to needy residents. Since 1938, article XVTI, § 1 of the New York Constitution has mandated that: “The aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner and by such means, as the legislature may from time to time determine.”
In Tucker v Toia (43 NY2d 1, 7 [1977]), the Court of Appeals explained the rationale behind this provision and the commitment it represents to all persons residing in New York State: “the provision for assistance to the needy is not a matter of legislative grace; rather, it is specifically mandated by our Constitution * * * [The provision to provide for the needy] was adopted * * * in the aftermath of the great depression, and was intended to serve two functions: First, it was felt to be necessary to sustain from constitutional attack the social welfare programs first created by the State during that period * * * and, second, it was intended as an expression of the existence of a positive duty upon the State to aid the needy.” This constitutional provision requires the State to come to the aid of all needy residents without regard to, inter alia, race, religion, sexual orientation or immigration status. Far from being an empty promise, the Court of Appeals has repeatedly reenforced this mandate. (Matter of Lee v Smith, 43 NY2d 453 [1977]; Matter of Jones v Berman, 37 NY2d 42 [1975].)
*879 In Tucker v Toia (supra, at 9), the Court of Appeals stated: “May the Legislature deny all aid to certain individuals who are admittedly needy, solely on the basis of criteria having nothing to do with need? Today, we hold that it may not.” Further, the State must provide assistance to destitute persons even if the cost of providing such assistance ultimately becomes a cost that the State or its subdivisions must bear without Federal reimbursement. (Matter of Jones v Berman, supra, at 54 [“The counties of this State * * * may not shirk their (State constitutional) responsibility to provide assistance to (the poor) merely because the higher levels of government refuse to share the cost”].)
In addition to the constitutional mandate to provide care and support to the needy, the Legislature also has addressed this issue. As noted, Family Court Act § 1055 (c) explicitly authorizes the Family Court to proactively order services to be provided by social services officials when necessary to facilitate the reunification of families. Not only does this statute advance the State’s policy that reasonable efforts must be made to reunite families (e.g., Matter of Dale P., 84 NY2d 72 [1994]; Matter of Michael B., 80 NY2d 299 [1992]; Matter of Nicole JJ., 265 AD2d 29 [3d Dept 2000]), but a related statute, Family Court Act § 1015-a, also expressly states that the failure of social services officials to provide court-ordered services “shall be subject to punishment [for contempt of court] pursuant to section seven hundred fifty-three of the judiciary law.” While the court can always enforce court orders by contempt, the Legislature here went out of its way to restate this principle because of the critical importance of Family Court service orders and their ability to further the State’s goal of family reunification.
Both New York Constitution, article XVII, § 1 and Family Court Act § 1055 (c) apply to all people residing in New York State. Neither provision expressly mentions or excludes any persons on the basis of their particular status (other than economic status); as such, no exclusion for undocumented aliens can be inferred. (See, McKinney’s Cons Laws of NY, Book 1, Statutes §§ 74, 96, 213; People v Finnegan, 85 NY2d 53, 58 [1995]; Matter of McDermott v Berolzheimer, 210 AD2d 559, 559-560 [3d Dept 1994]; Matter of Pritchard, 138 Misc 2d 945, 947 [Sur Ct 1988].) Accordingly, the August 8, 2000 order by this court that services be provided to Ms. Kittridge was an appropriate implementation of the law. That Ms. Kittridge is an undocumented alien does not relieve DSS of the immediate *880 obligation to provide her with emergency public assistance, emergency Medicaid and emergency housing.
The argument by DSS that Ms. Kittridge should be required to apply administratively to DSS and be found eligible before the services can be provided is without merit. If Ms. Kittridge had to apply administratively, the power of the court as articulated by the Legislature in Family Court Act § 1055 (c) would eífectivély be nullified. Because that could not have been the Legislature’s intent, the suggestion that an administrative process is a prerequisite to complying with a court order is specious. There is no administrative review of this court’s order by an agency of a municipal government; only the State appellate courts have that power.
Finally, the argument that DSS should not have been ordered to provide, or assist Ms. Kittridge in obtaining, emergency housing because it is not a “Housing Authority” is equally without merit. It is true that DSS is not the New York City Housing Authority. However, it is one of the primary agencies responsible for providing services to Ms. Kittridge; and, as noted, Family Court Act § 1055 (c) explicitly refers to housing services. Thus, pursuant to Family Court Act § 1055 (c), a DSS “official” may “assist * * * in obtaining adequate housing” by escorting Ms. Kittridge with a copy of the court’s August 8, 2000 order either directly to a homeless shelter, to a city official in the Department of Homeless Services or to the New York City Housing Authority. Accordingly, DSS is an appropriate “social services official” responsible for arranging services including emergency housing for Ms. Kittridge. (Social Services Law § 2 [9], [14].)
Ill
Given the foregoing, the court concludes that DSS must provide, or arrange for Ms. Kittridge to receive, all court-ordered services designed to reunite her with her son. If Ms. Kittridge does not receive public assistance, housing and treatment for her sickle cell anemia, it is likely that she will never be reunited with Sean. New York State law and public policy require that Ms. Kittridge be given the opportunity to raise her child, notwithstanding her immigration status. Accordingly, the motion is denied and DSS is directed to provide the aforementioned services forthwith.